Filed 2/23/15  P. v. Zambrano CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057642 |
| v. | (Super.Ct.No. FVA1201068) |
| JUAN PABLO ZAMBRANO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Dwight W. Moore, Judge.  Affirmed.

Jamie Popper, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

1

In this case, defendant Juan Pablo Zambrano was charged with sexually molesting Jane Doe on two separate occasions. A jury found defendant guilty of two counts of having sexual intercourse with a child who was 10 years of age or younger (Pen. Code,[1] § 288.7, subd. (a), counts 1, 3), and two counts of committing a lewd or lascivious act on a child who was under the age of 14 years (§ 288, subd. (a), counts 2, 4). The trial court sentenced defendant to 25 years to life on count 1 and 25 years to life on count 3 to run concurrently with the sentence on count 1. It further sentenced defendant to the upper term of eight years each for counts 2 and 4, but stayed imposition of those sentences pursuant to section 654.

On appeal, defendant challenges the sufficiency of the evidence to support the convictions on counts 1 through 3, contending (1) the testimony did not establish the element of penetration with a penis, and (2) Jane Doe's testimony about the first alleged incident was not reasonable, credible, and of solid value. Defendant also argues the trial court committed instructional error by instructing the jury that Jane Doe's testimony was sufficient to prove the charged counts, which relieved the People of its burden of proving the elements of the alleged crimes beyond a reasonable doubt. Finally, defendant contends the trial court erred by admitting into evidence a hearsay interview from Jane Doe in violation of his right to confront witnesses under the Sixth Amendment to the United States Constitution. We find no error and, therefore, we affirm the judgment.

---

[1] Unless otherwise indicated, all additional undesignated statutory references are to the Penal Code.

2

# I.

## FACTS

A.      *Prosecution Evidence*

Jane Doe's sister testified that on December 9, 2011, she lived in Fontana with her mother, defendant (her mother's boyfriend and Jane Doe's biological father), and three other siblings.  The sister testified that her mother and defendant slept on a bed in the garage, and that the door connecting the garage to the main house had no lock on it and was normally left open.  The sister went into the garage to wash some laundry but found that the door to the garage was closed and would not open.  After pushing hard on the door, she was able to open it.

When the sister entered the garage, she turned on the lights and saw Jane Doe sitting on the bed facing the door with her underwear and tights pulled down to her knees.  She also saw defendant standing next to the bed facing Jane Doe, with his boxer shorts and pants pulled down to his knees.  Defendant immediately sat down on the bed.  Defendant's back was to the sister when she walked in, and she did not see his genitalia.  Defendant was unable to pull his pants up before the sister entered the garage, so he covered himself with his hands and his shirt.  Jane Doe tried to pull up her tights, and then she ran to her sister.  The sister started screaming for her older brother to come to the garage, but he was not home at the time.  She then called 911.  After the police arrived, the sister spoke to Jane Doe about what had happened.  Jane Doe told her sister that defendant took her to the garage.  The sister did not see defendant touching Jane Doe.

3

Jane Doe, who was seven years old at the time of the trial, was called to the stand to testify. Jane Doe testified that she understood the difference between the truth and a lie, that she understood it is bad to lie, and she promised to truthfully answer the questions posed to her. Jane Doe did not remember the day the police came to her home, and she did not remember speaking to the police. Jane Doe testified that the defendant no longer lived with her "[b]ecause he was bad." When asked how defendant was bad, Jane Doe testified that defendant hit her in the arm and fought with her mother. She remembered going to the hospital for an examination and speaking to a nurse, but she did not remember speaking to someone the next day about what defendant did to her.

Jane Doe testified that she was scared about being in court and was worried about getting into trouble. Jane Doe did not remember being in the garage with her father or him pulling down her. Jane Doe testified that she calls her private parts a "cola," and that she calls a boy's private parts "balls" or a "weenie." She remembered the nurse examining her "cola" at the hospital, but she did not remember speaking to a man about it. Jane Doe testified that she was afraid to testify about her "cola" in front of so many people, and that she was afraid of being in court because defendant would get mad at her. When asked, "Is that why you don't remember some of the answers to the questions I'm asking you?" she replied, "U-huh. Yes."

Officer Hale of the Fontana Police Department responded to a report of possible child molestation and detained defendant inside the garage. Hale testified that Jane Doe appeared to be nervous, scared, and confused when he spoke to her. Jane Doe told the officer that defendant asked her to go into the garage to watch television, but when they entered the garage defendant closed the door and turned off the lights. She told the officer that defendant pulled down his pants, got onto the bed and pulled down her underpants, and then "placed his private into her private." When Officer Hale asked Jane Doe where her private was, she pointed to her groin area, and when asked where defendant's private was, she again pointed to her groin area. Jane Doe told the officer that defendant had never before "been nasty to her." She did not tell Hale that she saw defendant's penis.

Mirella DelDegan, a sexual assault nurse examiner, testified that she examined Jane Doe when she was transported to the hospital. When DelDegan asked what happened, Jane Doe "said she didn't want to talk about it." During the physical examination, DelDegan noticed a very small tear to the fossa navicularis of Jane Doe's genital area. DelDegan could not determine how Jane Doe received the tear, stating it was "a non-specific finding" and that the tear "could be caused by trauma from a sexual assault" or "by a number of other things." DelDegan found no other injuries. She described the results of the examination to be normal, which occurs in approximately 75 to 80 percent of child sexual abuse examinations. She explained that a child victim of sexual assault may present no physical injury because often the perpetrator will penetrate or rub his penis in the labia majora of the child's genitals without actually penetrating the

5

vagina. In such instances, "[t]he child thinks—feels like it's going inside because that's all they know, so a lot of times they will say—they will describe it as he put something inside me when they're actually describing that interlabial penetration."

Officer Coyle, a detective assigned to the Fontana Police Department's Sex Crimes and Crimes Against Children Unit, testified that she observed an interview of Jane Doe conducted on December 29, 2011, by a forensic interview specialist. The prosecutor then played a video of the interview, a transcript of which the trial court admitted into evidence. During the interview, Jane Doe said that defendant told her "let's go to the garage," and that he "pulled down [her] pants." When asked what defendant did next, Jane Doe said, "He put his private inside me." Jane Doe said she was about to "kick him," but her sister "stopped him" and saw him pull up his pants. Jane Doe also said that her sister called the police, and she had to talk to the police and go to the emergency room to be checked out. When asked if Jane Doe's father put his private inside her only one time, Jane Doe said he did it twice.

Jane Doe said the first time her father put his private inside her, "he did it to my mom and then he did it to me." Jane Doe said that while she was sleeping with her mother and father, he got "on top of her [mother], my mom [got] on top of him," and they "start[ed] kissing" and "[did] a lot of things." Her mother then told defendant, "stop it," and "then he did it to me" while her mother was asleep. Jane Doe said that defendant pulled down her pants, "pulled my legs up," "then he stuck his private inside mine." When asked where defendant put his private, Jane Doe said he put it "[i]nside my cola." Jane Doe said that her friends use other names for their "cola," such as "wee-wee," but

6

her mother calls it "cola." She said that her father did nothing to her "butt" or to her "boobs," and that he did not put his private in any other part of her body. When asked how her "cola" felt after defendant put his private inside her, Jane Doe said she could not remember, but it did not hurt. Jane Doe said her mother did not hear or see anything because she was sleeping.

Jane Doe said the second time defendant put his private inside her was on the bed in the garage. Defendant asked Jane Doe in a whisper to go with him to the garage, but she said "no" because she was playing with her new toy. He then carried Jane Doe to the garage. Jane Doe said defendant closed the door to the garage and she lay down on the bed to watch television. Defendant then turned off the lights in the garage. When asked if defendant's private was hard or soft when he put it inside her "cola," Jane Doe testified it was soft and that nothing came out of it. Jane Doe said she did not see defendant's private, but she knew defendant put his private inside her because she felt it. When asked if defendant's private did anything or moved while it was inside her, Jane Doe answered, "No." Defendant told Jane Doe not to tell anyone about what he did or he would get mad at her. Jane Doe said she felt terrible about what happened to her. When asked if she told her mother about what happened, Jane Doe said she told her mother that defendant "was doing nasty stuff to me." When asked to mark on a diagram where her "cola" was located, Jane Doe drew an "X" on the groin area where a vagina would be. On another diagram, Jane Doe drew an "X" on the groin area where a penis would be when asked to show where defendant's "private is" located. She said that defendant did not put anything else inside her "cola" during either incident.

7

Officer Coyle spoke to Jane Doe at the district attorney's office the day after Jane Doe testified. Coyle played portions of the video of Jane Doe's interview, and Jane Doe remembered being interviewed. Jane Doe told Coyle that she was truthful during the interview. When Coyle asked why she was unable to relate what happened to her while on the stand testifying, Jane Doe said she was afraid of getting into trouble, and she was afraid defendant would hit her.

B.      *Defense Evidence*

Cari Caruso, a registered nurse and sexual assault nurse examiner, testified that she reviewed the medical reports and photographs taken of Jane Doe and the report prepared by DelDegan of the results of her examination of Jane Doe. In the photographs she reviewed, Caruso did not see the small superficial tear to the fossa navicularis reported by DelDegan, but she noticed some moisture. Caruso made no abnormal findings regarding Jane Doe's inner thighs or her genitals. Caruso agreed with DelDegan's "non-specific" findings, noting that, in her review of the photographs, she observed "hygiene issues," which may cause tissue breakdown, irritation, inflammation, and sometimes infection to the genitals. Caruso testified that finding a small or superficial abrasion on a child's genitals does not automatically result in a diagnosis of sexual abuse, and that a "non-specific" finding means the injury could have resulted from sexual abuse or from something else. Finally, Caruso testified that nothing in DelDegan's report confirmed with certainty that there was sexual contact or penetration.

On cross-examination, Caruso testified that she did not perform a physical examination of Jane Doe. She testified that even if she had seen a tear in the fossa navicularis, she would not be able to say whether or not it was the result of a sexual assault. Finally, Caruso testified that interlabial penetration by a penis might cause an abrasion as it stretches the tissue, but it might cause no injury at all.

Jane Doe's mother testified that defendant sometimes stayed overnight at her home, and that they slept together on a bed in the garage. She testified that Jane Doe never slept with her and defendant in the same bed, and she never saw defendant touch Jane Doe in a sexually inappropriate manner. She also testified that she never had sexual intercourse with defendant in front of Jane Doe.

C.      *Verdicts and Sentences*

A jury found defendant guilty on both counts of having sexual intercourse with a child who was 10 years of age or younger (§ 288.7, subd. (a), counts 1, 3), and on both counts of committing a lewd or lascivious act on a child who was under the age of 14 years (§ 288, subd. (a), counts 2, 4). The trial court sentenced defendant to 25 years to life on count 1 and 25 years to life on count 3 to run concurrently with the sentence on count 1. It further sentenced defendant to the upper term of eight years each for counts 2 and 4, but stayed imposition of those sentences pursuant to section 654.

Defendant timely appealed.

9

II.

DISCUSSION

A.    *The Record Contains Substantial Evidence to Support the Jury's Verdicts*

Defendant contends the record contains insufficient evidence to support his convictions on counts 1 and 3 because the People did not establish beyond a reasonable doubt that he penetrated Jane Doe's vagina with his penis, and that the evidence to support his conviction under counts 1 and 2 is insufficient because Jane Doe's testimony about the first alleged incident was vague and contradictory. We disagree.

"'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Smith* (2014) 60 Cal.4th 603, 617.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 715.)

"'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.]'" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) "'Conflicts and even testimony which is subject to justifiable suspicion do

10

not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Finally, "a jury is entitled to reject some portions of a witness' testimony while accepting others. [Citation.]"[2] (*People v. Allen* (1985) 165 Cal.App.3d 616, 623.)

Section 288.7, subdivision (a), provides: "Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 25 years to life." As used in rape and other sex crimes statutes, "'sexual intercourse' has a common meaning . . . and that the term can only refer to vaginal penetration or intercourse. [Citations.]" (*People v. Stitely* (2005) 35 Cal.4th 514, 554.) The trial court in this case properly instructed the jury with CALCRIM No. 1127 that "sexual intercourse" in violation of section 288.7, subdivision (a), requires vaginal penetration.

---

[2] The trial court instructed the jury with CALCRIM No. 226, which provides in relevant part, "You may believe all, *part*, or none of any witness's testimony." (Italics added.)

11

For purposes of unlawful "sexual intercourse," the prosecution need not prove that the defendant fully penetrated the victim's vagina with his penis. Slight penetration, including penetration of the labia majora without further penetration into the vagina, satisfies the element of sexual intercourse for sex crimes. (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1097 (*Dunn*) ["The conviction on count 1 required proof that [the defendant] had 'sexual intercourse' with Minor (§ 288.7, subd. (a)), which required penetration of her labia majora, not her vagina"]; *People v. Quintana* (2001) 89 Cal.App.4th 1362, 1366-1371 [evidence that the defendant penetrated the victim's labia majora with his finger was sufficient to prove sexual penetration with a foreign object in violation of § 289, subd. (j)]; *People v. Karsai* (1982) 131 Cal.App.3d 224, 232-233, disapproved on another ground in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8 [evidence that the defendant pushed his penis into the victim's labia majora was sufficient to prove rape by force or violence in violation of former § 261, subds. (2), (3)].) Again, the trial court in this case properly instructed the jury with CALCRIM No. 1127 that "[s]exual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis."

During the forensic interview, Jane Doe told the interviewer that defendant put his "private" inside her on two different occasions. Jane Doe said that the first time he did it, she was sleeping with her mother and defendant on the bed in the garage. She described her mother and father engaging in sexual intercourse on the bed next to her, and then said, "he did it to my mom and then he did it to me." While her mother slept, defendant pulled down her pants, pulled her legs up, and "then he stuck his private inside mine."

12

Jane Doe described her private as her "cola," and she accurately identified on anatomical charts where her genitals are located and where defendant's penis would be. Jane Doe could not remember how it felt when defendant stuck his penis inside her "cola," but she said it did not hurt. During the second incident, she said defendant carried her to the garage, closed the door, and turned off the lights. Defendant then pulled down her pants, and "[h]e put his private inside me." Jane Doe said defendant's private was soft when he put it inside her "cola," and that nothing came out of it. Although Jane Doe said she did not see defendant's private, she knew that defendant put his private inside her because she "felt his weenie inside."

As defendant points out in his brief, Jane Doe's statements during the interview were somewhat contradictory and inconsistent. For instance, when the interviewer asked Jane Doe if anything happened to her, she unhesitatingly talked about the second incident in the garage when her sister walked in. When asked about the first incident, Jane Doe said, "I always forget that one. I have to remember." However, she proceeded to tell the interviewer "it was with my mom and then he did it to me." Likewise, Jane Doe said she knew defendant placed his private inside her during the second incident because she "felt it," but she could not remember if she felt it the second time. Notwithstanding these and other conflicts in Jane Doe's statement, she consistently said that defendant placed his penis inside her vagina. She may not have seen it, but she expressly said she felt it inside her the second time, and she said defendant put nothing else inside her on either occasion.

Moreover, the medical testimony did not contradict Jane Doe's statement. DelDegan testified that she found a small tear on the fossa navicularis of Jane Doe's genitals. Although DelDegan could not definitively say the tear was caused by sexual abuse, she testified that 75 to 80 percent of child sexual abuse victims have normal findings when examined, and that penetration of a female child's labia majora by a perpetrator's penis will not necessarily cause injury. DelDegan also testified that a female child may report feeling the perpetrator's penis inside her when there is interlabial penetration but no penetration into the vagina. Although Caruso testified that she did not observe the tear to Jane Doe's fossa navicularis, she did not physically examine Jane Doe and only reviewed medical reports and photographs. Caruso's testimony was consistent with DelDegan, in that Caruso agreed with DelDegan's "non-specific" finding that a tear would not have necessarily been caused by sexual abuse, and that interlabial penetration would not necessarily cause injury.

Based on the foregoing evidence, a reasonable jury could conclude beyond a reasonable doubt that defendant put his penis inside Jane Doe during both incidents. The conflicts in Jane Doe's statement were resolved by the jury, and we may not reweigh the evidence or second-guess the jury's credibility determinations. While the evidence did not establish full vaginal penetration, the evidence of interlabial penetration was substantial and sufficient to establish both counts of sexual intercourse with a child 10 years old or younger in violation of section 288.7, subdivision (a). (*Dunn*, *supra*, 205 Cal.App.4th at p. 1097.) In addition, the record contains substantial evidence to establish both counts of lewd and lascivious conduct in violation of section 288, subdivision (a).

14

B. *The Trial Court Did Not Err by Instructing the Jury with a Modified CALCRIM No. 1190*

The trial court properly instructed the jury with CALCRIM No. 301 that "[t]he testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The trial court also instructed the jury with a modified CALCRIM No. 1190 that "[c]onviction of any charged or lesser crime in this case may be based on the testimony of a complaining witness alone." Defendant argues that, because the trial court inserted the words "in this case" into CALCRIM No. 1190, a reasonable juror might have understood the instruction "to inform him or her that Jane Doe's testimony in fact was substantial evidence to convict appellant." Consequently, defendant argues the instruction relieved the prosecution of its burden of proving every element of the crimes charged beyond a reasonable doubt, and it violated his federal and state constitutional rights. We disagree.

"A claim of instructional error is reviewed de novo." (*People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 759, citing *People v. Guiuan* (1998) 18 Cal.4th 558, 569-570.) "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803-804.)

15

Defendant wisely does not dispute the validity of CALCRIM No. 1190 in general. Previously, CALJIC No. 10.60 provided that "[i]t is not essential to a finding of guilt on a charge of [rape] [unlawful sexual intercourse] [(sexual activity)] that the testimony of the witness with whom sexual relations is alleged to have been committed be corroborated by other evidence." The California Supreme Court held that such an instruction "correctly stat[es] the law." (*People v. Gammage* (1992) 2 Cal.4th 693, 700; see also Evid. Code, § 411.)

As the People argue, defendant interposed no objection to any of the jury instructions, so arguably he forfeited his challenge on appeal. But even assuming defendant did not forfeit his challenge, defendant is wrong. Fairly read, no reasonable juror would interpret the instruction in the manner suggested by defendant. In its unmodified state, CALCRIM No. 1190 states in its entirety: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone." The sole modification in defendant's trial was that the trial court substituted the language "a sexual assault crime" with "any charged or lesser crime in this case." The words "in this case" clearly referred to the words which immediately preceded it—"any charged or lesser crime." Neither logic nor grammar supports the suggestion that "in this case" referred to "the testimony of a complaining witness," such that the emphasis of the instruction was on the strength or conclusiveness of Jane Doe's statement. Properly read in conjunction with CALCRIM No. 301, the instruction meant, at most: Conviction of any charged or lesser crime *alleged in the first amended information* may be based on the testimony of a

16

complaining witness alone, *if you believe the complaining witness*.  It did not direct the jury to conclude that Jane Doe's statement was, in fact, believable.

Moreover, "[a] single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury.  [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 287.)  The trial court correctly instructed the jury with CALCRIM No. 200 that "[y]ou must decide what the facts are," and that "[i]t is up to all of you, and you alone to decide what happened."  That same instruction properly informed the jury to consider the instructions together as a whole.  At the start of the trial and again after the close of evidence, the trial court correctly instructed the jury with CALCRIM No. 226 that "[y]ou alone, must judge the credibility or believability of the witnesses."  After the close of evidence, the court accurately instructed the jury on what factors they should consider when determining credibility and believability.  Finally, the court accurately instructed the jury with CALCRIM No. 330 on how it should decide whether the testimony of a child who is 10 years old or younger was truthful and accurate, and correctly instructed the jury with CALCRIM No. 318 that, if it believed Jane Doe's out-of-court statements, it could use those statements in evaluating the believability of her in-court testimony.

Read as a whole, the instructions made it clear to the jury that they, *and not the trial court*, were the sole deciders of whether Jane Doe's statements were believable and sufficient to sustain a conviction beyond a reasonable doubt.  We must presume the jury understood and properly applied the instructions.  (*People v. Myles* (2012) 53 Cal.4th

17

1181, 1212*.)* Therefore, we conclude the trial court did not err by instructing the jury with the modified CALCRIM No. 1190.

> C. *Admission of Jane Doe's Hearsay Statements Did Not Violate Defendant's Right to Confront Witnesses*

Defendant contends the trial court abused its discretion by admitting into evidence the video and transcript of Jane Doe's interview. He argues: (1) Jane Doe's statements about the alleged sexual abuse constituted testimonial hearsay for purposes of the Sixth Amendment confrontation clause; (2) Jane Doe's testimonial hearsay was only admissible if she was subject to cross-examination; and (3) although Jane Doe was sworn and testified, she had no recollection of the alleged sexual abuse and was so young and scared as to render her completely unavailable for cross-examination. The People concede that Jane Doe's statement during the interview was "arguably testimonial" hearsay for purposes of the confrontation clause, but contend admission of Jane Doe's hearsay statements did not violate defendant's Sixth Amendment rights because Jane Doe actually testified in court and was available for cross-examination. We agree with the People.

Over defendant's objection, the trial court admitted the video and transcript of Jane Doe's interview into evidence pursuant to Evidence Code section 1360. "Section 1360 creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse. [Citations.] Section 1360 safeguards the reliability of a child's hearsay statements by requiring that: (1) the court find, in a hearing conducted outside the

18

presence of the jury, that the time, content, and circumstances surrounding the statement(s) provide sufficient indicia of reliability; (2) the child either testifies at the proceedings, or, if the child is unavailable to testify, other evidence corroborates the out-of-court statements; and (3) the proponent of the statement gives notice to the adverse party sufficiently in advance of the proceeding to provide him or her with a fair opportunity to defend against the statement. [Citations.]" (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367, fn. omitted.) The parties appear to be in agreement that the federal constitution imposes an additional requirement to Evidence Code section 1360 that the child victim be subject to cross-examination while testifying in court or, if the child is unavailable to testify, that the defendant had a prior opportunity to cross-examine the child.

"[T]he Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L.Ed.2d 597, 100 S.Ct. 2531], the United States Supreme Court construed that right as allowing the admission at trial of an out-of-court statement if it fell within a 'firmly rooted hearsay exception' or had 'particularized guarantees of trustworthiness.' The high court overruled that decision 24 years later, in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). There, the court created a general rule that the prosecution may not rely on 'testimonial' out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. (*Id*. at p. 59.)" (*People v. Lopez* (2012) 55 Cal.4th 569, 576.)

19

Jane Doe did, in fact, testify at trial, which would ordinarily foreclose a confrontation clause challenge to the admission of testimonial hearsay. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford*, *supra*, 541 U.S. at p. 59, fn. 9, citing *California v. Green* (1970) 399 U.S. 149, 162 (*Green*); see also *People v. Bryant*, *Smith and Wheeler* (2014) 60 Cal.4th 335, 413.) However, defendant contends Jane Doe testified that she was unable to remember the alleged incidents of sexual abuse and, because she was unable to testify about the acts which formed the alleged crimes, defendant did not have a fair opportunity to cross-examine her and test her credibility.

In *Green*, the high court held that admission at trial of a witness's prior inconsistent statements did not violate the defendant's confrontation clause rights because the witness actually testified and was subject to cross-examination about his out-of-court statements. (*Green*, *supra*, 399 U.S. at pp. 164, 168.) The court identified the purposes of confrontation as: "(1) insur[ing] that the witness will give his statements under oath— thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forc[ing] the witness to submit to cross- examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permit[ting] the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." (*Id*. at p. 158, fn. omitted.) The court noted that "a narrow question lurking" in the case was whether the witness's "apparent lapse of memory so affected [the defendant's] right

20

to cross-examine as to make a critical difference in the application of the Confrontation Clause," but the majority concluded the issue was not yet ripe for decision. (*Id*. at pp. 168-169.)

In his concurring opinion in *Green*, Justice Harlan addressed that lurking question. "The fact that the witness, though physically available, cannot recall either the underlying events that are the subject of an extra-judicial statement or previous testimony or recollect the circumstances under which the statement was given, does not have Sixth Amendment consequence. The prosecution has no less fulfilled its obligation simply because a witness has a lapse of memory. The witness is, in my view, available. To the extent that the witness is, in a practical sense, unavailable for cross-examination on the relevant facts, . . . I think confrontation is nonetheless satisfied." (*Green*, *supra*, 399 U.S. at pp. 188-189, fn. omitted (conc. opn. of Harlan, J.).)

In *United States v. Owens* (1988) 484 U.S. 554 (*Owens*), the United States Supreme Court squarely addressed the question left unanswered in *Green*, "whether . . . the Confrontation Clause of the Sixth Amendment . . . bars testimony concerning a prior, out-of-court identification when the identifying witness is unable, because of memory loss, to explain the basis for the identification." (*Owens*, at pp. 555-556.) The court agreed with Justice Harlan's concurrence in *Green*, explaining: "'[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."' [Citations.]" (*Owens*, at p. 559.) "It is sufficient," the court continued, "that the defendant has the opportunity to bring out such matters as the witness' bias, his lack of

21

care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, [citation]) the very fact that he has a bad memory." (*Ibid*.)  Although the "weapons available to impugn the witness' statement when memory loss is asserted will of course not always achieve success," the court concluded that "successful cross-examination is not the constitutional guarantee." (*Id*. at p. 560.)  "Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions." (*Id*. at p. 561.)  Notwithstanding *Crawford*'s "dramatic departure from prior confrontation clause case law" (*People v. Harris* (2013) 57 Cal.4th 804, 840), our Supreme Court has held that "[n]othing in *Crawford* casts doubt on the continuing vitality of *Owens*." (*People v. Cowan* (2010) 50 Cal.4th 401, 468.)

Here, Jane Doe testified that she did not remember the alleged incidents of sexual abuse or talking to the police about them.  When asked, "Do you remember a day when police officers came to your house?" Jane Doe answered, "No."  Jane Doe testified that defendant no longer lived in her house "because he was bad," explaining that he hit her.  When asked if defendant had "done anything else bad to you that you can remember?" Jane Doe replied, "No."  Jane Doe could not remember talking to the police about defendant, but did remember going to the hospital for an examination.  When asked if she remembered "a day when you were in the garage with your dad?" Jane Doe responded, "Probably no."  Jane Doe answered the prosecutor's general questions about whether there was a bed inside the garage to her home, where defendant slept, whether her sister would do laundry in the garage, and if she had done anything in the garage other than

22

help her sister do laundry.  She could not remember being interviewed "about you and your dad."

Jane Doe testified that she was "[a] little" scared about being in court, and that she was worried about getting into trouble.  When asked if she was "telling the truth when I asked you if you ever spoke to police officers?" Jane Doe answered, "Yes."  The prosecutor asked her again if she remembered speaking with police officers, and Jane Doe again answered, "No."  When asked if she remembered "a time when you were in the garage with your dad and he took your pants down?" she replied, "No."  She also answered, "no" when asked if she remembered "talking to officers about a time when something happened to you in your mom and dad's bed while your mom was asleep?"  Jane Doe remembered talking to a nurse and that the nurse examined her "cola," but she did not remember talking to a man about her "cola."  Jane Doe testified she was afraid defendant would get mad at her for testifying in court, and that was why she did not "remember some of the answers to the questions" posed to her by the prosecutor.

During cross-examination, defense counsel asked Jane Doe general questions about whether she watched television in the garage, about her siblings and the people who live in her house, about what she studied in school, and whether she understood the difference between the truth and a lie.  Defense counsel asked Jane Doe if defendant yelled at her, and if she felt sad when defendant fought with her mother.  Counsel did not ask Jane Doe any questions about what she said during her interview.

23

Based on Jane Doe's inability to remember the alleged acts of sexual abuse or to remember that she spoke to police officers about it, defendant contends Jane Doe was for all intents and purposes unavailable as a witness and he had no meaningful opportunity to cross-examine her. The defendant in *People v. Perez* (2000) 82 Cal.App.4th 760 (*Perez*) made a similar argument. There, a witness "repeatedly answered 'I don't remember' or 'I don't recall' to virtually all the questions asked [of] her about what she saw the night of [a] murder and what she told the police." (*Id*. at p. 763.) A police officer testified that the witness told him she was afraid she would be shot if she testified, and the witness's prior statements to the police were admitted into evidence. (*Ibid*.) On appeal, the defendant argued admission of the hearsay statements violated his right to confront witnesses because her inability to remember what happened meant he "'had no effective means of cross-examining the witness.'" (*Id*. at p. 765.)

The Court of Appeal noted that the defendant's "argument erroneously equates confrontation with a cross-examination which is effective from a defense point of view," and "is not what the constitutional right to confront witnesses requires." (*Perez*, *supra*, 82 Cal.App.4th at p. 765.) After discussing *Green* and *Owens*, the Court of Appeal found no constitutional violation. "The witness . . . was not absent from the trial. She testified at length at trial and was subjected to lengthy cross-examination. The jury had the opportunity to observe her demeanor, and the defense cross-examined her about bias. Even though she professed total inability to recall the crime or her statements to police, and this narrowed the practical scope of cross-examination, her presence at trial as a testifying witness gave the jury the opportunity to assess her demeanor and whether any

24

credibility should be given to her testimony or her prior statements. This was all the constitutional right to confrontation required. [Citations.]" (*Perez*, at pp. 766-767, fn. omitted.)

As in *Perez*, Jane Doe testified in open court and was subject to direct and cross-examination. Although her inability to recall the alleged acts of sexual abuse or to recall speaking to the police about the acts limited the value of cross-examination, defendant was not limited in what he could ask Jane Doe, and he could have used the opportunity to sow doubt about her credibility as a witness and about the credibility of her hearsay statements.

Defendant relies on *United States v. Spotted War Bonnet* (8th Cir. 1991) 933 F.2d 1471, which stated: "To be sure, simply putting a child on the stand, regardless of her mental maturity, is not sufficient to eliminate all Confrontation Clause concerns. If, for example, a child is so young that she cannot be cross-examined at all, or if she is 'simply too young and too frightened to be subjected to a thorough direct or cross-examination[,]' [citation], the fact that she is physically present in the courtroom should not, in and of itself, satisfy the demands of the Clause." (*Id*. at p. 1474.) That quote is dicta (see *Cookson v. Schwartz* (7th Cir. 2009) 556 F.3d 647, 651), and we have found no published California decision that has adopted such a rule. Even if we were to agree with that dicta, the record does not demonstrate that Jane Doe lacked the mental maturity needed to testify. She clearly articulated an understanding of the difference between telling the truth and telling a lie, and she understood the importance of testifying truthfully. Moreover, although Jane Doe testified to being scared about testifying in front of so

25

many people (especially in front of her father) about her genitals, the record does not demonstrate that she was so gripped with fear that she could not testify or be cross-examined.

Nor does defendant's reliance on *State v. Rohrich* (Wash. 1997) 939 P.2d 697 support his argument. There, the prosecution "called [the child victim] to the stand as its first witness and asked her several questions including what school she went to, what she got for her birthday, and what her cat's name was. [The victim] was not asked about and did not testify about any alleged abuse. Defense counsel did not cross-examine her." (*Id*. at p. 699, fn. omitted.) The Washington Supreme Court held that, for purposes of the confrontation clause and a state law permitting use of hearsay statements from a child sexual abuse victim, the requirement that the victim "[t]estifies at the proceedings" is not satisfied if the prosecution does not elicit testimony about the subject of the hearsay statements, to wit, the alleged sexual abuse and, therefore, the defense is not afforded an opportunity to cross-examine the victim about the alleged sexual abuse. (*Id*. at pp. 699-703.) In contrast, the prosecutor in this case tried to elicit from Jane Doe testimony about the subject of her hearsay statements. The prosecutor expressly asked Jane Doe if she remembered the day the police came to her house, if she remembered being in the garage with her father, if she remembered talking to the police about what her father had done to her, if she remembered if something happened while she was in bed with her mother and father, if her father had done anything else bad to her other than hit her, and if she remembered him pulling down her pants. Jane Doe answered, "no" to all of those questions but, as

26

already stated, defendant had the opportunity to cross-examine Jane Doe and to call into doubt her credibility as a witness and hence the credibility of her hearsay statements.

Because Jane Doe testified at trial and was subject to cross-examination, we conclude that admission of Jane Doe's hearsay statements did not violate defendant's right to confront witnesses.

## III.

## CONCLUSION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____
J.

We concur:

RAMIREZ_____
P. J.

HOLLENHORST_____
J.

27